UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

BRONSWELLUS D. KENT,           )
                               )
    Plaintiff,                 )
                               )
v.                             )     Case No. CV409-013
                               )
ST. JOSEPH'S/CANDLER HOSPITAL, )
                               )
    Defendant.                 )

## REPORT AND RECOMMENDATION

Proceeding pro se, Bronswellus D. Kent complains that his former employer, defendant St. Joseph's/Candler Health System, Inc. (SJC), discriminated against him in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, based on his race and sex. Doc. 1 at 2. He also accuses SJC of unlawfully retaliating against him for opposing its employment practices. *Id.* SJC moves, over Kent's opposition, for summary judgment under Fed. R. Civ. P. 56. Doc. 21, 30. Its motion should be **GRANTED** and this case should be dismissed.

## I. GOVERNING STANDARDS

### A. Summary Judgment

Rule 56 requires a court to enter summary judgment where the record, taken as a whole, establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'material' if it might affect the outcome of the case under the governing law. . . . It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party." *Baker v. Sears, Roebuck & Co.*, 903 F.2d 1515, 1518 (11th Cir. 1990) (citations omitted).

The moving party "always bears the initial responsibility of informing the [trial] court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has shown that the party bearing the burden of proof at trial lacks evidence on an essential element of his claim, the burden of production shifts to the nonmoving party "to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Rule 56(e)).

"Although reasonable inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, that party 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment' to show that there is a genuine issue for trial." *Tidmore v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1387 (11th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). A mere scintilla of evidence supporting the non-moving party's position will not fulfill its burden. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). The Court must consider the entire record in the case, not just those portions of the record which have been singled out for attention by the parties. *Baker*, 903 F.2d at 1519.

### B. Title VII

Title VII makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color,

3

religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Active (disparate treatment) as well as passive (failing to put an end to a co-employee created, hostile environment) discrimination is prohibited. The former typically involves an employer disciplining a minority employee more harshly than a white employee. *See, e.g., Thomas v. Cobb County Sheriff's Dep't*, 2010 WL 431468 at * 7 (N.D. Ga. Feb. 4, 2010). The latter can arise when an employer fails to prevent, for example, majority racial group employees from racially harassing a minority employee, *see, e.g., Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010), or male employees from sexually harassing female employees. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807-08 (11th Cir. 2010); *Blackmon v. Wal-Mart Stores East, L.P.*, 358 F. App'x 101, 104 (11th Cir. 2009).

Either way, a Title VII plaintiff must show that the employer intended to discriminate against him because of his membership in a particular protected group. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact

4

that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.").

Finally, Title VII also prohibits employers from discriminating against employees in retaliation for their opposition to any unlawful employment practice of the employer, or in retaliation for making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). To

> establish a prima facie case of retaliation, Title VII requires the plaintiff to establish that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal relation between the protected activity and the adverse action. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). "After the plaintiff has established the elements of a claim, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability." *Id*. Once the employer makes this showing, "the plaintiff has a full and fair opportunity to demonstrate that the [employer's] proffered reason was merely a pretext to mask discriminatory action." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir.2009).

*Blackmon*, 358 F. App'x at 104.

The plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001);

*Mora v. Univ. of Miami*, 15 F. Supp. 2d 1324, 1333 (S.D. Fla. 1998). Where a plaintiff produces no direct or statistical evidence of discrimination, he must rely on circumstantial evidence from which an inference of intentional discrimination may be drawn. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994). Where the plaintiff relies on circumstantial evidence, the court employs the burden-shifting framework set forth in *McDonnell Douglas*.

Under a common formulation of the *McDonnell Douglas* framework, to establish a prima facie case of unlawful termination based on race, the plaintiff must establish by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was terminated from employment; (3) the employer treated similarly situated employees outside the protected class more favorably; and (4) he was qualified to do the job. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).

There are specific criteria to apply depending upon the nature of the discrimination claim. In disparate treatment cases involving an employer's discipline, for example, the plaintiff must adduce

[e]vidence that similarly situated employees are disciplined more leniently is admissible to support a disparate treatment claim when the plaintiff has established that the co-employees are in fact similarly situated. Thus, the plaintiff must show that the comparator employees are "involved in or accused of the same or similar conduct" yet are disciplined in a different, more favorable manner.

*Anderson v. WBMG-42*, 253 F.3d 561, 564 (11th Cir. 2001) (citations omitted).[1]

Hostile environment claims, in contrast, involve more subtle distinctions. *See Reeves*, 594 F.3d at 809-11 (for hostile-sex environment claims, there must be severe or pervasive, gender-specific conduct that the employer knew about and allowed as if it had authorized it; the environment must be "both subjectively and objectively hostile" as judged

---

[1] As one court more fully explained:

In order to prevail on his disparate treatment theory, plaintiff must identify a white employee to which he is "similarly situated in all relevant respects." *Knight v. Baptist Hosp. of Miami*, 330 F.3d 1313, 1316 (11th Cir.2003). To prevent courts from second-guessing an employer's reasonable decision, "[t]he comparator must be nearly identical to the plaintiff." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir.2004). In a termination case, in particular, the plaintiff must show that the misconduct for which he was discharged was "nearly identical" to that engaged in by an employee outside the protected class who was retained. *Rioux v. City of Atlanta*, 520 F.3d 1269, 1280 (11th Cir.2008). "Misconduct merely 'similar' to the misconduct of the [terminated] plaintiff is insufficient." *Id.*

*Thomas*, 2010 WL 431468 at * 7.

from the perspective of a reasonable person in the plaintiff's position, considering all of the circumstances).

If the plaintiff succeeds in proving a prima facie case of discrimination or retaliation, he has established a presumption of the unlawful conduct. *Burdine*, 450 U.S. at 253-54 ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for plaintiff's rejection."). The defendant then has the burden of producing a legitimate, nondiscriminatory reason for the challenged employment action. *See id.* at 254 (emphasizing that defendant's burden is one of production: "The defendant need not persuade the court that it was actually motivated by the proffered reasons"). If a legitimate, nondiscriminatory reason is articulated by the defendant, the plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. *Id.* at 256.

## II. ANALYSIS

In his EEOC filing Kent stated that SJC hired him

> as a Pharmacy Technician on July 6, 2007. On May 19, 2008, I complained to Ms. Patel, Pharmacy Manager, about the racial

remark that Andy Hughes (White male and a thirty year employee), Staff Pharmacist, made in my presence and two other African American co-workers. On various occasions, I and other African American co-workers, have been harassed and subjected to derogatory comments by Mr. Hughes.

During the week of June 2, 2008, I was physically assaulted on the job with a pill spatula by Courtney Perry, an African American female coworker. I reported the incident to Ms. Patel. I requested a transfer to the satellite hospital or a schedule change, so as not to continue enduring the harassment by Mr. Hughes and the continuous threats to do bodily harm by Ms. Perry. I was discharged on June 5, 2008.

May 19, 2008 Ms. Patel told me she would handle the situation. I was never informed of the results of the investigation regarding the racial comments directed by Hughes. On or about June 2, 2008 Ms. Patel stated that I should finish the shift and she would handle the situation regarding Ms. Perry. Ms. Patel gave no reason for failing to acknowledge my request for a transfer. The reason given on my separation notice states, " Involuntary_Separation."

I believe that I have been discriminated against because of my race, African American, sex, male and in retaliation for opposing discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. 1 at 3. In his sworn Complaint, Kent elaborates:

After being attacked at work by a female co-worker, as well as being slandered with racially motivated,[2] negative comments by one of the male pharmacists [i.e., Hughes], I reported both incidents to our manager, Ms. Patel. I was later confronted by Ms. Patel whom I

---

[2] In his deposition Kent equated the word "to slander" with to inflict emotional harm on another by casually using racial slurs in workplace conversation. Doc. 20 at 191-94.

recorded, telling me in a threatening manner that she does not like ultimatums. Later I proceeded to speak to Ms. Patel's superiors about the attack and subsequent threats of harm to me. I exhausted all channels available at that time. Upon Ms. Patel's return from vacation[,] I requested a transfer to the satellite hospital or a schedule change, so as not to continue enduring the harassment of Mr. Hughes and the continuous threats to do bodily harm by Ms. Perry. I was discharged on June 5, 2008. Also recorded was my conversation with Ms. Aveille, in which she stated that my identity would remain anonymous to Mr. Hughes for making a complaint about him. This was also not done. All conversations and interviews were recorded. I am not exact about dates, but all incidents happened at [St. Joseph's] Candler Hospital and Candler Human Resources.

Doc. 4 at 3-4 (footnote added). Kent seeks $5,000,000 in damages. *Id.* at 4.

SJC deposed him. Doc. 21-3. He testified that that he was the only black male working in SJC's Pharmacy. Doc. 20 at 52-53. SJC asked him what facts supported his race claim:

Q. Tell me the facts that support your race claim.

A. That I wouldn't have -- it would be a black male. That's it. There would be no just race. Being a black male was the discrimination.

Q. It's because you were male that you were discriminated it?

A. Black male, yes. Because it goes along with being told what I was -- something that was said to me during the course of these events.

Doc. 20 at 53. In other words, Kent conjoined his race and sex discrimination claim: "[b]eing a black male was the discrimination." *Id.* He then tied that to the comments his supervisor, SJC pharmacist Andy Hughes, made to him:

> Q. All right. Describe, describe those comments or racial remarks to me.
>
> A. The one claim was about a comment made, specifically the terms "you people" about -- it was a reference to a pair of shoes that a pharmacist had on. And the pharmacist was Andy Hughes. [¶] A few other comments as calling black people colored and telling of hunting stories. *That's it.*
>
> Q. Okay. Those are all the facts that you have that support your race discrimination claim?
>
> A. I mean, basically the off-colored comments, yes.
>
> Q. The off-colored comments?
>
> A. The off-colored comments. The race-specific jokes and, yes --
>
> Q. You told me about three things.
>
> A. Right.
>
> Q. One is a comment about "you people"?
>
> A. Uh-huh.
>
> Q. One is a reference to black people as being colored?

A. Yes.

Q. And the third is a hunting story?

A. That also referenced black people as colored. So, it all ties in together.

Q. Pardon me?

A. They all tie in together. It's happened more than one time. And our manager was fully aware of these comments.

Doc. 20 at 54-55 (emphasis added).

Kent thus bases his entire race discrimination claim, which includes insisting that he was "harassed," on *three* comments that Hughes allegedly made during Kent's eleven-month employment: (a) Hughes' use of the phrase "you people" when speaking to Kent and two other employees about Hughes' new shoes, and (b) Hughes' use of the word "colored" on two occasions when telling hunting stories to plaintiff. "Q. Okay. And Andy Hughes is the only one who discriminated against you on the basis of your race? A. Solely, yes." Doc. at 72-73.[3]

---

[3] When confronted at his deposition with this obvious paucity of *intentional* discrimination evidence, Kent endeavored to bolster his case. He claimed that Hughes discriminated against him by: (1) allowing other employees to leave without completing their work, resulting in additional work for Plaintiff who worked the closing shift, and (2) requiring him to perform additional duties outside of his work responsibilities. Doc. 20 at 74-76. However, he admitted that he never raised these

Kent at most advances a hostile race environment claim, since he fails to point to any comparator (that similarly situated non-protected employees were treated better than him) evidence.[4] So viewed, his claim

---

allegations in his Complaint or, more notably, in his EEOC Charge or his EEOC Intake Questionnaire. *Id.* at 73; *see also* doc. 4 (Complaint) (EE, C, and D). **EE?**

SJC argues that these claims are barred because Kent did not raise them in his EEOC charge. Doc. 21-2 at 7 n. 5. The dividing line here is whether the facts he alleged in the charge could be reasonably extended to encompass any "new" claim that may be said to be inextricably intertwined with the original claim. *Gregory v. Ga. Dep't of Human Resources*, 355 F.3d 1277, 1280 (11th Cir. 2004); *see also Hillemann v. Univ. of Cent. Fla.*, 167 F. App'x 747, 749-50 (11th Cir. 2006). If the claim is reasonably ascertainable from the EEOC charge, then it is not barred in the subsequent lawsuit. If not, then it is barred. *See, e.g., Jerome v. Marriott Residence Inn Barcelo Crestline/AIG*, 211 F. App'x 844, 846-47 (11th Cir. 2006).

Kent grounded the race portion of his EEOC complaint on the hostile environment Hughes created by saying "you people" and telling "colored" stories. Deep into this litigation, and during his deposition, he sought to enlarge his hostile racial environment complaint to one of disparate treatment. *That* is a whole new claim, not reasonably inferable from his EEOC charge. It thus is barred here.

Even were it considered now, it would still fail because Kent cannot show, other than via sheer speculation, that SJC treated similarly situated non-protected employees more favorably. He admits that white employees who worked the closing shift also would have had more responsibilities if other employees failed to complete their work before leaving. Doc. 20 at 96-98. And, he cannot produce any evidence that Hughes did not require non-protected employees to perform similar duties outside of their work responsibilities. Doc. 20 at 78.

---

[4] Although the Eleventh Circuit "reiterate[d] that disparate treatment under 42 U.S.C. § 2000e-2(a)(1) is the proper framework under which to evaluate hostile work environment claim," *Reeves*, 594 F.3d at 808 n. 2, it is also obvious from the long line of cases in this area that there is no need for a hostile-environment plaintiff to point to comparator evidence (i.e., that the employer treated similarly situated whites better), as that concept is built-in to the claim (the white victimizers were obviously "better treated" in a work environment racially hostile toward blacks).

fails because Title VII "is not a civility code, and . . . harassment must discriminate on the basis of a protected characteristic in order to be actionable. . . ." *Reeves*, 594 F.3d at 809-10 n. 3. That means random instances involving bigoted, insulting language or conduct will simply not constitute discrimination in the terms and conditions of employment. "Workplace conduct," it must be remembered, "cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context; . . . a plaintiff can prove a hostile work environment [only if he shows] *severe* or *pervasive* discrimination directed against [his] protected group. . . ." *Id.* at 807 (emphasis added).

Kent has shown nothing like that here. And long before he filed this case the Supreme Court illuminated the border line, to be policed by lower courts, between the bumps and grinds of workplace clashes and severe or pervasive, legally actionable, line-crossing conduct. That Court emphasized that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is *beyond* Title VII's purview." *Oncale v. Sundowner Offshore Servs.*, 523

U.S. 75, 81 (1998) (emphasis added). Here Kent does not argue anything severe, only pervasive. But pervasive means that the employer is aware of but simply fails to interdict extreme, persistent, and workplace-saturating behavior that renders the work atmosphere intolerable to any objectively reasonable human being, and not simply the hypersensitive or litigious individual. *See, e.g., Beckford v. Dep't of Corr.*, 605 F.3d 951, 953-56 (11th Cir. 2010) (prison inmates' persistent, gender-specific verbal harassment and "gunning masturbation" aimed at prison's female employees was sex-based and highly offensive conduct that could be used to establish a Title VII claim against their department of corrections employer, which knew of but failed to remedy a multi-year long, sexually hostile environment).

In short, no *severe* or *pervasive* conduct has been cited here. A "you people" utterance by a supervisor, plus two stories where he used the word "coloreds," simply does not rise to a Title VII case. Furthermore, the "spatula spat" with co-employee Perry (he was "stabbed" by an angry *black* female, doc. 20 at 108) is simply *devoid* of racial content, as is Kent's complaint over supervisor Patel's failure to address that incident to his

15

personal satisfaction. *See* doc. 20 at 98-109, 187-88. Hence, plaintiff's race-based claim is without merit. And he confirmed in his deposition that he brought no sexual harassment-based, discrimination claim. Doc. 20 at 187.

That leaves his retaliation claim. It, too, is without merit. After Perry "attacked" Kent, he complained to supervisory staff. He does not rebut SJC's Employee Relations Manager's affidavit and investigatory notes showing that Perry was dealt with promptly, yet Kent decided that he would no longer work with Perry. Doc. 21-6 at 8; *see also* doc. 20 at 160-179. He does not deny that it was not up to him to decide with whom he would work. Nor does he rebut SJC's showing that he resigned because he refused to work with Perry again. Doc. 21-6 at 10. SJC's articulated, legitimate, nonretaliatory reason for its actions having gone unrebutted, Kent's retaliation claim also fails.

## III. CONCLUSION

Defendant St. Joseph's motion for summary judgment (doc. 21) should be **GRANTED**, and this case should be **DISMISSED** with

prejudice.

**SO REPORTED AND RECOMMENDED** this  6th  day of July, 2010.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT of GEORGIA